Slip Op. 13-55

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| VICTORIA'S SECRET DIRECT, LLC, | |
| Plaintiff, | |
| v. | Before: Timothy C. Stanceu, Judge |
| UNITED STATES, | Court No. 07-00347 |
| Defendant. | |

## OPINION

[Determining the tariff classification of a women's garment]

Dated: May 1, 2013

*Frances P. Hadfield*, *Alan R. Klestadt* and *Robert B. Silverman*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, NY.

*Beverly A. Farrell*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (*Justin R. Miller* and *Karen V. Goff*), of New York, NY for defendant United States.  With her on the briefs were *Tony West*, Assistant Attorney General and *Barbara S. Williams*, Attorney in Charge, International Trade Field Office.  Of counsel on the briefs was *Michael W. Heydrich*, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection, of New York, NY.

Stanceu, Judge: Plaintiff Victoria's Secret Direct, LLC ("Victoria's Secret") brought this

action to contest the tariff classification that U.S. Customs and Border Protection ("Customs" or

"CBP") applied to a women's garment made of predominantly-cotton knitted fabric and

containing an interior fabric insert marketed as a "shelf bra."  The garment, Victoria's Secret

style number 194-423, was marketed under the description "Bra Top" and imported by Victoria's

Secret in July 2006.  Compl. ¶¶ 6, 16 (Nov. 21, 2007), ECF No. 5.  It is worn on the upper body,

has narrow straps, and has no shoulder or neck coverage.  *Id*. ¶¶ 24, 30, 31.  Defendant United

States maintains that the Bra Top is properly classified as a "tank top" or similar article, as

Customs determined upon liquidation.  Answer ¶ 9 (Mar. 24, 2008), ECF No. 8.  Plaintiff claims

classification of the Bra Top as a "brassiere" or similar article or, in the alternative, under a

residual provision for other garments of cotton, knitted or crocheted.

      Based on the findings of fact and conclusions of law stated herein, determined following

a bench trial, the court concludes that the subject merchandise is properly classified according to

plaintiff's alternative claim.

## I. BACKGROUND

      Victoria's Secret entered a shipment of Bra Tops on July 19, 2006 at the Port of Seattle,

Washington on entry number 113-3588476-0.  Summons (Sept. 17, 2007), ECF No. 1; Compl.

¶ 2.  The commercial invoice described the merchandise as "ladies knit sleeveless basic tank

pack with shelf bra tank top (95 pct cotton 5 pct spandex)."  Joint Pretrial Order, Schedule C ¶ 4

(Nov. 29, 2011), ECF No. 53 ("JPO").  Upon liquidating the entry on June 1, 2007, Customs

classified the merchandise in subheading 6109.10.00, Harmonized Tariff Schedule of the United

States ("HTSUS") (2006) ("T-shirts, singlets, tank tops and similar garments, knitted or

crocheted: Of cotton"), at 16.5% *ad val*.[1]  Answer ¶ 9.  Victoria's Secret timely protested the

determination of classification on June 29, 2007 (protest no. 3001-07-100282).  Summons 1.

Customs denied the protest on July 19, 2007 without issuing an official ruling.  *Id.*  On

September 17, 2007, Victoria's Secret timely filed its summons, *id.*, and on November 21, 2007,

Victoria's Secret filed its complaint, claiming classification in subheading 6212.90.00, HTSUS

("Brassieres, girdles, corsets, braces, suspenders, garters and similar articles and parts thereof,

---

[1] Because the entry at issue in this case occurred in 2006, the court's citations to the
Harmonized Tariff Schedule of the United States ("HTSUS") are to the 2006 version.

whether or not knitted or crocheted: Other") at 6.6% *ad val*, Compl. ¶¶ 11-26.  In the alternative,

plaintiff claims classification in subheading 6114.20.00, HTSUS ("Other garments, knitted or

crocheted: Of cotton"), at 10.8% *ad val*.  *Id*. ¶¶ 28-34.

Due to the presence of common issues of fact, the court directed that this case be tried

jointly with *Lerner New York, Inc. v. United States*, Court No. 07-00361.[2]  The parties submitted

identical post-trial briefing in the *Victoria's Secret* and *Lerner* actions.  Pls.' Post-Trial Br.

(Feb. 22, 2012), ECF No. 68 ("Pl.'s Mem."); Def.'s Post-Trial Mem. of Law (Feb. 22, 2012),

ECF No. 67 ("Def.'s Mem.").  Plaintiff responded to defendant's post-trial brief on March 23,

2012.  Resp. to Def.'s Post-Trial Br. (Mar. 23, 2012), ECF No. 71 ("Pl.'s Resp.").[3]

## II. DISCUSSION

The court exercises jurisdiction over this action pursuant to Section 201 of the Customs

Courts Act of 1980, 28 U.S.C. § 1581(a).[4]  In cases contesting the denial of a protest, the court

makes its findings of fact *de novo* based upon the record made before the Court, 28 U.S.C.

§ 2640(a), and "the merchandise itself is often a potent witness."  *Simod Am. Corp. v. United*

*States*, 872 F.2d 1572, 1578 (Fed. Cir. 1989) (citations omitted).  The plaintiff has the burden of

---

[2] *Lerner New York, Inc. v. United States*, Court No. 07-00361, involved the classification of a garment marketed as the "Bodyshaper", imported in May 2005.  Compl. ¶ 15 (Oct. 10, 2007), ECF No. 2 (Court No. 07-00361).  Like the garment at issue in this action, the Bodyshaper is a women's sleeveless outerwear garment made of knit fabric that contains an interior fabric insert marketed as the "shelf bra."  *Id*. ¶¶ 11, 14, 16-18.

[3] Following submission of post-trial briefs, defendant filed a motion to strike portions of plaintiff's post-trial brief and a motion for oral argument.  Def.'s Mot. (1) To Strike and Disregard Certain Portions of Pls.' Post-Trial Brs. and (2) To Req. Oral Arg. 3, 8 (Mar. 1, 2012), ECF No. 69.  Plaintiff opposed defendant's motion to strike but not its motion for oral argument.  Pls.' Resp. in Opp'n to Def.'s Mot. to Strike and Disregard Certain Portions of Pls.' Post-Trial Br. 1-2, 12 (Mar. 20, 2012), ECF No. 70.  The court denied defendant's motion to strike and also its motion for oral argument.  Order (May 1, 2013), ECF No. 72.

[4] All statutory citations herein are to the 2006 edition of the United States Code unless otherwise noted.

establishing that the government's classification of the subject merchandise was incorrect but

does not bear the burden of establishing the correct classification; instead, it is the court's

independent duty to arrive at "the *correct* result, by whatever procedure is best suited to the case

at hand." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984).  In making this

determination, the court "must consider whether the government's classification is correct, both

independently and in comparison with the importer's alternative." *Id*.  While "[t]he proper scope

and meaning of a tariff classification term is a question of law[,] . . . determining whether the

goods at issue fall within a particular tariff term as properly construed is a question of fact."

*Franklin v. United States*, 289 F.3d 753, 757 (Fed. Cir. 2002) (citations omitted).

On questions of law, a Customs' classification decision may be accorded a "respect

proportional to its 'power to persuade.'" *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001)

(quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  But when Customs has summarily

denied a protest of the classification without issuing an official ruling, the court considers the

parties' arguments without deference.  *Hartog Foods v. United States*, 291 F.3d 789, 791 (Fed.

Cir. 2002).  Pursuant to 28 U.S.C. § 2639(a)(1), a trial begins with a statutory presumption of

correctness for the factual components of a Customs classification decision.  To overcome the

presumption, the party challenging that decision must produce a preponderance of evidence on a

disputed factual question.  *See Universal Elecs., Inc. v. United States*, 112 F.3d 488, 492 (Fed.

Cir. 1997).

Classification under the HTSUS is determined according to the General Rules of

Interpretation ("GRIs") and, if applicable, the Additional U.S. Rules of Interpretation ("ARIs").

GRI 1 requires that tariff classification, in the first instance, "be determined according to the

terms of the headings and any relative section or chapter notes."  GRI 1, HTSUS.  The chapter

and section notes of the HTSUS are not optional interpretive rules but statutory law.  *Libas, Ltd.*

*v. United States*, 193 F.3d 1361, 1364 (Fed. Cir. 1999).  Once imported merchandise is

determined to be classifiable under a particular heading, a court must look to the subheadings to

find the correct classification of the merchandise in question.  *Orlando Food Corp. v. United*

*States*, 140 F.3d 1437, 1440 (Fed. Cir. 1998) (citations omitted).

  Tariff acts are construed to carry out the intent of Congress, which is initially determined

by looking at the language of the statute itself.  *Rubie's Costume Co. v. United States*, 337 F.3d

1350, 1357 (Fed. Cir. 2003) (citations omitted).  When "a tariff term is not defined in either the

HTSUS or its legislative history, the term's correct meaning is its common or dictionary

meaning in the absence of evidence to the contrary."  *Russell Stadelman & Co. v. United States*,

242 F.3d 1044, 1048 (Fed. Cir. 2001) (citations omitted).  In the absence of a showing of a

commercial designation, the common meaning and commercial meaning of a tariff term are

presumed to be the same.  *Id.* at 1048-49; *see also Carl Zeiss, Inc. v. United States*, 195 F.3d

1375, 1379 (Fed. Cir. 1999).  In order to define tariff terms, the court may "consult lexicographic

and scientific authorities, dictionaries, and other reliable information" or may rely on its "own

understanding of the terms used."  *Baxter Healthcare Corp. v. United States*, 182 F.3d 1333,

1337-38 (Fed. Cir. 1999) (citation omitted).  Although "not legally binding," the Explanatory

Notes ("ENs") to the Harmonized Commodity Description and Coding System ("Harmonized

System" or "HS"), maintained by the World Customs Organization, "may be consulted for

guidance and are generally indicative of the proper interpretation of a tariff provision."  *Degussa*

*Corp. v. United States*, 508 F.3d 1044, 1047 (Fed. Cir. 2007) (citing *Motorola, Inc. v. United*

*States*, 436 F.3d 1357, 1361 (Fed. Cir. 2006)).  Where a tariff term has various definitions or

meanings and has broad and narrow interpretations, the court must determine which definition

best expresses the congressional intent.  *Richards Medical Co. v. United States*, 910 F.2d 828,

830 (Fed. Cir. 1990).

In this action, plaintiff claims classification of the Bra Top in subheading 6212.90.00,

HTSUS ("[b]rassieres, girdles, corsets . . . and similar articles"), at 6.6% *ad val*., and in the

alternative, in subheading 6114.20.00, HTSUS, a residual provision for knitted cotton garments,

at 10.8% *ad val*.  The government advocates classification in subheading 6109.10.00, HTSUS

at 16.5% *ad val*., arguing that the Bra Top falls within the scope of heading 6109 ("T-shirts,

singlets, tank tops and similar garments, knitted or crocheted").

Based on the factual findings and conclusions of law set forth below, the court

determines that the Bra Top is properly classified in subheading 6114.20.00, HTSUS.  The court

rejects defendant's classification because the Bra Top is not described by any term within the

article description for heading 6109, HTSUS.  The court rejects plaintiff's primary classification

claim because the Bra Top does not answer to the article description of heading 6212 HTSUS

("Brassieres, girdles, corsets, braces, suspenders, garters and similar articles and parts thereof,

whether or not knitted or crocheted").

## A.  Findings of Fact Pertaining to the Bra Top

The following uncontested facts were agreed to by the parties in the joint pretrial order

entered by the court on November 29, 2011:[5]

1. The marketing name for Victoria's Secret style 194-423 is the "Bra Top."  JPO, Schedule C ¶ 10.

2. The commercial invoice describes the Bra Top as "ladies knit sleeveless basic tank 3 pack with shelf bra tank top (95 pct cotton 5 pct spandex)."  JPO, Schedule C ¶ 4.

3. The Bra Top is made of knit fabric that is 95% cotton and 5% spandex.  JPO, Schedule C ¶¶ 11, 12.

[5] Certain uncontested facts in the joint pretrial order are taken from defendant's response to plaintiff's first request for admissions directed to defendant, plaintiff's exhibit 14.  As per USCIT Rule 36(b), the admissions contained in defendant's response are deemed "conclusively established," as no motion for withdrawal or amendment of the admissions has been made.

4.  The Bra Top is an upper body garment.  JPO, Schedule C ¶ 8.

5.  The Bra Top contains a "built-in shelf bra for hidden support" consisting of an inner layer of fabric that covers the bust of the wearer.[6]  JPO, Schedule C ¶¶ 9, 15.

6.  The built-in shelf bra is attached solely at the top of the garment, the bottom of the shelf bra not being attached to the outside fabric layer of the garment.  JPO, Schedule C ¶¶ 19, 23.

7.  The built-in shelf bra has an elastic band attached to the bottom that is designed to be worn under the bust of the wearer.  JPO, Schedule C ¶¶ 17, 18.

8.  The shelf bra is intended to be form-fitting over the bust and to change the natural shape of the breasts of the wearer.[7]  JPO, Schedule C ¶ 25, 26.

9.  The Bra Top has 3/8" straps that go over the top of the wearer's shoulders.  JPO, Schedule C ¶¶ 21-22.

10. Victoria's Secret's marketing website describes Bra Tops as "[s]exy scoopneck tops with built-in shelf bra for hidden support.  Three tops, three colors, one great price.  Imported cotton."  JPO, Schedule C ¶¶ 5, 15.

11. The Bra Top is sold in sizes XS (extra small) through XL (extra large).  JPO, Schedule C ¶ 13.

### 1.  Findings of Fact Established by Non-Testimonial Evidence

From its *in camera* inspection of two samples of the Bra Top, admitted into evidence as plaintiff's Exhibit 4 and defendant's Exhibit A, the court finds, by a preponderance of the evidence, certain facts pertaining to the physical characteristics of the Bra Top, as follows.  One

---

[6] Defendant's response to plaintiff's first request for admissions also admits that Victoria's Secret Direct, LLC designed the Bra Top to be worn without a separate brassiere even though the garment is not designed to provide the same amount of support as a traditional brassiere.  Pl.'s Ex. 14 (Resp. 32).

[7] Defendant's response to plaintiff's first request for admissions also admits that the Bra Top provides support to the bust of the wearer but states that the support is not significant and dissimilar to that provided by traditional brassieres.  Pl.'s Ex. 14 (Resp. 14).  The response also admits that the Bra Top provides similar "containment" to a soft-cup brassiere made by Wacoal while distinguishing "containment" from "support."  *Id*. (Resp. 29).

sample is a size small in black and the other a size medium in aquamarine; each is a knitted

garment made up of opaque fabric labeled as 95% cotton and 5% spandex, a fabric that has an

elastic "stretch" quality.  Pl.'s Ex. 3, Def.'s Ex. A.  The garment has a low neckline shaped to

form a wide U at the front and back, with the fabric tapering upward to the four points where the

3/8" hem sewn on to the upper edge of the garment converges with the straps.  *Id.*  The

3/8-inch-wide straps do not appear to be comprised of the body fabric of the garment but rather

appear to be integral with the hem sewn onto the upper portion of the body fabric, each strap

consisting of a double thickness of the hem fabric.  *Id.*  The "shelf bra" component consists of an

internal layer of the same fabric that forms the body of the garment but with a sewn-on elastic

band, approximately 7/8" wide, extending the entire circumference of the bottom of the shelf bra

component.  *Id.*  Other than the straps, no component of the shelf bra is visible from the outside

of the Bra Top.  *Id.*  The shelf bra is formed from two pieces of fabric (front and back) that are

sewn together and that together extend around the entire upper, inner portion of the garment.  *Id.*

The fabric immediately above the elastic band is gathered by the band.  *Id.*  The top of the shelf

bra is attached to the body of the garment only at the upper hem of the garment and is attached

around the entire circumference of the upper hem.  *Id.*

      From the other exhibits, the court finds, by a preponderance of the evidence, the

following facts.

1. The pre-production 2006 re-fit documentation for the Bra Top describes the garment as a "cami style 3 PK scoop nk tank."  Pl.'s Ex. 2.

2. The marketing of the Bra Top emphasizes the body support and coverage aspects of the garment.  Pl.'s Ex. 10.

3. Victoria's Secret's marketing website depicts the Bra Top being worn outdoors with no layering garment on top.  Pl.'s Ex. 10.

4.  The Bra Top is designed for a moderately tight fit on the body of the wearer, as
    demonstrated by a photograph on the marketing website exhibit and the garment samples,
    which demonstrate the stretch quality of the body fabric.  Pl.'s Exs. 3,10; Def.'s Ex. A.

## 2.  Findings of Fact Established by Testimonial Evidence

At trial, Victoria's Secret produced three witnesses who testified on various factual matters relevant to the merchandising and technical design of the Bra Top, one witness who testified on various factual matters relevant to the support provided by the Bra Top, and one witness, identified as an expert, who testified on various matters relevant to brassiere design, construction, and fitting.  Defendant produced a single witness, identified as an expert, who testified on various matters related to brassiere fitting, sale, and marketing.

From the evidence on the record made before the court, the court makes findings of fact as set forth below.

## a.  Findings of Fact Established by the Testimony of Ms. Denise Schramm

Victoria's Secret introduced the testimony of Ms. Denise Schramm, vice president of merchandising at Victoria's Secret.  Tr. 232.  Ms. Schramm testified that in that capacity she creates strategies for upcoming product assortments, determines what products were successful in the marketplace, and sets pricing for those products.  *Id*. at 233-34.  She also testified that before joining the apparel division of Victoria's Secret in 2006, she worked as a buyer for Saks Fifth Avenue, Henri Bendel, Brooks Brothers, and Lane Bryant.  *Id*. at 230-32.  The court found her testimony as a fact witness credible based on her demeanor and her demonstrated knowledge concerning the background of the company's Bra Top product.  Ms. Schramm's testimony established, by a preponderance of the evidence, the following facts.

1.  Victoria's Secret markets the Bra Top as a wardrobe "essential" that can be worn by
    itself as a top, layered under a blouse, or layered under sweaters.  Tr. 240, 256.

2.  Consumers indicate to Victoria's Secret that they purchase the Bra Top for its
    comfort, functionality, and support.  Tr. 242-43.

3.  The Bra Top sells in higher volume during the spring than the fall season.
    Tr. 255-56.

4.  "Most important" to Victoria's Secret, from "a merchandising perspective," is that the
    Bra Top provides the wearer "[t]he support of a bra and the use of a top in one."
    Tr. 262-63.

5.  The Bra Top style has been sold since 2006, if not earlier.  Tr. 242.

6.  Victoria's Secret considers the "Cami Bra Top" currently featured on the Victoria's
    Secret website, style number 256-943, to be the successor to style number 194-423.
    Tr. 245-47.

7.  Style number 256-943 incorporated modifications to style number 194-423, including
    a lengthening at the bottom, brushing of the inner side of the elastic band of the shelf
    bra to provide softness, and shortening of the shelf bra to provide more support in the
    small garment size.  Tr. 257-58.

8.  Style number 256-943 is marketed on the Victoria's Secret website with the words
    "choose your colors to build the perfect tank wardrobe" and "the lightest layer of
    support is built right in."  Tr. 255.

### b.  Findings of Fact Established by the Testimony of Ms. Valerie Keast

Plaintiff introduced the testimony of Ms. Valerie Keast, an associate vice president of

merchandising at Victoria's Secret, who has been with the company since 2000.  Tr. 267-68,

279.  Ms. Keast has a background in textiles and textiles marketing.  *Id*. at 267.  The court found

her testimony as a fact witness to be credible based on her demeanor and the detail of her factual

knowledge about the company's development of the Bra Top and its goals in bringing the

garment to market.  By a preponderance of the evidence, her testimony established the following

facts.

1.  As a member of Victoria's Secret's cut and sew-knit clothing division, Ms. Keast
    developed the Bra Top.  Tr. 268, 282.

2.  Victoria's Secret brought the Bra Top into its assortment "because it was a top that
    provided support in lieu of a bra."  Tr. 268.

3.  The Bra Top was strategized, developed, and marketed as a "layering cami."  Tr. 283.

4.  In developing the Bra Top, Ms. Keast intended this garment to be worn as an "everyday piece" and did not intend that it would be worn with a separate brassiere.  Tr. 293.

5.  The Bra Top is situated within Victoria's Secret's knit top merchandising division and not its brassiere division.  Tr. 282.

6.  The Bra Top is produced only in sizes extra small to extra large, and not in different cup sizes.  Tr. 282-83.

### c.  Findings of Fact Established by the Testimony of Ms. Diane Lynch

During trial, Victoria's Secret introduced the testimony of Ms. Diane Lynch, who testified that since 2007 she has worked as a designer at Victoria's Secret Production. Tr. 301-02.  She testified that she previously designed brassieres and other intimate apparel at Vogue Bra and Lane Bryant and that in her thirty-year career she has developed more than five hundred brassieres, many of which are still available in the market.  *Id*. at 296-98, 302-03.  She also testified that she has developed "shelf bra camis."  *Id*. at 315-16.  The court found her testimony as a fact witness credible based on her demeanor and demonstrated familiarity with the characteristics of the Bra Top.  Ms. Lynch's testimony established, by a preponderance of the evidence, the following facts.

1.  The front part of the shelf bra is of a "one piece cup construction" and has been "shaped with gathering added into it at the bottom" to form "an underbust band for support" that allows the garment to function "as a support garment."  Tr. 305.

2.  The straps of the Bra Top cannot be assigned to an individual component of the garment, *i.e.*, they cannot be assigned to either the shelf bra component or to the "camisole shell." Tr. 336.

3.  The Bra Top's shelf bra has components similar to those of soft-cup brassieres made by manufactures such as Wacoal and Hanro, *i.e.*, straps, a single cup, and an elastic underbust band.  Tr. 305, 311-14, 317.

4.  The Bra Top is designed to be worn as a layering piece.  Tr. 318, 324.

5.  Ms. Lynch participated in a fitting of the Bra Top in November 2009 with fit model Christina Trainer.  Tr. 355-56.

6. At the November 2009 fitting, Ms. Lynch confirmed visually and through measurement that the Bra Top fit Ms. Trainer well and resulted in a natural, supported bust shape. Tr. 326-27, 331.

7. At the November 2009 fitting, Ms. Lynch concluded that the Bra Top provided support and lift superior to that provided by a soft-cup brassiere manufactured by Hanro (style 1200).  Tr. 326-27, 330-31.

d.  Findings of Fact Established by the Testimony of Ms. Christina Trainer

Ms. Christina Trainer appeared as fact witness for plaintiff.  Ms. Trainer testified that she

is a professional fit model specializing in the fitting of lingerie and swimsuits.  Tr. 183, 187.  Ms.

Trainer testified that she has fitted thousands of garments in the six years she has been a model,

including brassieres and "shelf bra camisoles" produced by Victoria's Secret.  *Id.* at 188, 190,

200, 207-08, 221.  The court found Ms. Trainer's testimony as a fact witness to be credible based

on her demeanor and the detail of her testimony regarding the fitting of the Bra Top.  Her

testimony established, by a preponderance of the evidence, the following facts.

1. Referring to the fitting conducted in November 2009, Ms. Trainer stated that that the Bra Top she modeled was more supportive than the Hanro style 1200 and the Wacoal style 835140 soft-cup brassieres, which she also modeled.  Tr. 194-95, 209.

2. Ms. Trainer stated that the November 2009 fitting was conducted in the same manner as a typical fitting.  Tr. 222.

3. Ms. Trainer was compensated for her fitting of the subject merchandise.  Tr. 209.

4. When the November 2009 fitting was conducted, Ms. Trainer was unaware that the fitting was intended to be used for litigation purposes.  Tr. 222.

e.  Findings of Fact Established by the Testimony of Ms. Alexandra Armillas

Victoria's Secret introduced the testimony of Ms. Alexandra Armillas, a witness

identified by plaintiff as an expert on the design of brassieres and other garments.  Ms. Armillas

testified that she is a tenured full-time assistant professor and intimate apparel liaison in the

fashion design department at the Fashion Institute of Technology in New York City, where she

has taught for the past ten years.  Tr. 380-81.  Ms. Armillas testified that she has designed

numerous brassieres in her career and also has designed garments similar to the Bra Top. *Id.*

at 384, 480. Based on her credentials and experience, the court concludes that Ms. Armillas

qualifies as an expert in the design of brassieres and in garments identical or similar to the Bra

Top. The court found her testimony on the design of these garments to be credible based on her

demeanor and the knowledge she demonstrated in her testimony and expert witness report,

plaintiff's exhibit 15. Ms. Armillas' expert testimony established, by a preponderance of the

evidence of record, the following facts.

1. A garment known in the apparel industry as a "shelf bra camisole" combines a camisole and a brassiere in a single garment, so that a third piece, a separate brassiere, need not be worn underneath. Tr. 401, 403.

2. A shelf bra camisole is designed for two purposes, coverage and support. Tr. 403.

3. The Bra Top is a type of shelf bra camisole. Tr. 461.

4. In the early 1990s, Ms. Armillas designed shelf bra camisoles. Tr. 480.[8]

5. The Bra Top cannot be separated into two independently functioning garments because the straps would have to be used for both garments. Tr. 470-71.

6. The Bra Top's cup, underbust band, and straps all work together to provide support to the wearer's bust. Tr. 409.

7. The straps of the Bra Top are not integral with the body of the garment, *i.e.*, the straps are not built up from the fabric that constitutes the body of the garment. Tr. 479-80.

8. The shelf bra feature of the Bra Top provides support in a manner identical to that of soft-cup brassieres produced by Wacoal and Hanro. Tr. 401.

9. Ms. Armillas conducted a fitting of the Bra Top in August 2010 with Ms. Trainer as the fit model. Tr. 399-400.

---

[8] In using the term "camisole," Ms. Armillas explained that she was referring to a type of garment worn on the upper body that usually covers the body from the top of the breast to the waist. Tr. 408.

10. At the August 2010 fitting, Ms. Armillas confirmed visually and through measurement that the Bra Top provided support to Mr. Trainer's bust as a result of the presence of the shelf bra.  Tr. 409.

Ms. Armillas gave certain opinion testimony concerning her understanding of the term "tank top."  She testified that in her opinion the Bra Top is not a tank top because a tank top has straps made of fabric integral with the body of the garment, while the Bra Top, which has attached straps, does not.  Tr. 478-80.  She indicated that a tank top has low arm holes.  *Id.* at 479.  She also testified that in her opinion a tank top could have a shelf bra and still be a tank top, a garment to which she would refer as a "shelf bra tank top," with the shelf bra mentioned first, just as she would refer to the Bra Top as a "shelf bra camisole."  *Id.* at 481.  Further, Ms. Armillas testified that shelf bra camisoles were in commerce in the 1990s but could not give an opinion on whether they existed in commerce in 1988 or 1989.  *Id.* at 480.

f.  Testimony of Ms. Cindy Johnson

Defendant introduced at trial the testimony of Ms. Cindy Johnson, who testified that since 1998 she has owned and operated a small lingerie boutique in Denver, Colorado that sells high-end brassieres and other women's garments.  Tr. 497-98.  In particular, she testified that her store sells traditional European brassieres, *id.* at 555-56, at retail prices upwards of $110, *id.* at 555.  She added that her store does not sell the Bra Top but does sell garments that Ms. Johnson considers to be somewhat similar to the Bra Top.  *Id.* at 533.

Without objection from the plaintiff, defendant moved to qualify Ms. Johnson as an expert witness "in the fitting of bras, the components of bras, the function of bras and the purpose of bras in a woman's wardrobe," a motion the court granted.  *Id.* at 534-35.  Ms. Johnson testified, *inter alia*, that in her opinion the Bra Top "is a camisole and not a bra" because, in her opinion, the main purpose of a bra is as a foundation garment that provides

"shape and support and lift." *Id*. at 538-39.  Ms. Johnson's testimony, taken as a whole, did not

state or imply that the Bra Top fails perform a body support function.  *See id*. at 538.

 3.  Summary of Principal Findings of Fact Pertaining to the Support Function of the Bra Top

   From the facts upon which the parties agreed in the joint pre-trial order, as well as a

preponderance of the evidence introduced to the record at trial, the court finds that the Bra Top is

designed to provide support to the bust of the wearer.  Tr. 242-43, 255, 268, 305, 401, 403, 409.

The court also finds, from a preponderance of the evidence produced at trial, that a Bra Top,

style number 194-423, provided a certain degree of such support when worn at the fitting of

Ms. Trainer, the fit model, and that this fitting involved a Bra Top in Ms. Trainer's correct

garment size.  *Id*. at 188, 356, 406, 409.

  B.  Conclusions of Law Pertaining to the Choice of Heading for the Bra Top

   The court first considers whether plaintiff has shown the government's classification of

the Bra Top under heading 6109 to be incorrect.  *Jarvis Clark Co.*, 733 F.2d at 876.  The court

concludes that plaintiff has made this showing.  The court sets forth its reasoning below.

   1.  The Bra Top Is Not Properly Classified under Heading 6109, HTSUS

   The court's inquiry begins with GRI 1, under which the court considers terms of headings

and any relative section and chapter notes.  GRI 1, HTSUS.  The headings of section XI of the

HTSUS ("textiles and textile articles") encompass various textile materials, fabrics, and articles,

including articles of apparel.  Within the section, chapter 61 ("Articles of apparel and clothing

accessories, knitted or crocheted") "applies only to made up knitted or crocheted articles."

Note 1 to ch. 61, HTSUS.  Chapter 62 "applies only to made up articles of any textile fabric

other than wadding, excluding knitted or crocheted articles (*other than those of heading 6212*)."

Note 1 to ch. 62, HTSUS (emphasis added).  Because the first question is whether the

government's classification has been shown to be incorrect, *Jarvis Clark Co.*, 733 F.2d at 876

(citations omitted), the court first will determine, according to GRI 1, whether the Bra Top is

described by any term of heading 6109.  The court concludes that it is not.  The article

description for heading 6109 is "T-shirts, singlets, tank tops and similar garments, knitted or

crocheted."  The Bra Top is a knitted "garment,"[9] but, as discussed below, it is not one of the

garments named in the heading and is not of a type that was intended to be included within the

heading as a garment "similar" to the named garments.

The HTSUS nomenclature is harmonized with the internationally-developed HS

nomenclature up to the six-digit level, *i.e.*, to the two-digit "chapter," the four-digit "heading,"

and the six-digit "subheading" levels.  *See* Investigation with Respect to the Operation of the

Harmonized System Subtitle of the Omnibus Trade and Competitiveness Act of 1988 at 1

(USITC Pub. No. 2296) (June 1990).  The article description for the internationally-harmonized

heading 61.09 in the Harmonized System is "T-shirts, singlets and other vests, knitted or

crocheted," from which the terms of heading 6109, HTSUS are derived.  The court considers the

terms of HS heading 61.09 and the relationship of this heading to other HS headings in

chapters 61 and 62 to be informative as to the intended scope of heading 6109, HTSUS.  *See*

EN 61.09 (emphasis added).[10]

T-shirts and singlets, which are identified *eo nomine* in HS heading 61.09, are expressed

in the article description as examples of "vests."  The term "vest" has multiple meanings, but in

_____

[9] A "garment" is defined generally as an article of outer or underclothing.  *Webster's
Third New International Dictionary of the English Language (Unabridged)* 936 (2003)
("*Webster's Dictionary*").

[10] This article description for heading 61.09 ("T-shirts, singlets and other vests") is
unchanged from the original version effectuated in the Harmonized Commodity Description and
Coding System ("Harmonized System" or "HS").  Summary Record of the Harmonized System
Committee and its Working Party, ITC Annex Doc. 30.070 at 6,762 (1989).

the context of the article description, which is expressed in British English, the term refers to an

undershirt. *Webster's Third New International Dictionary of the English Language*

*(Unabridged)* 2547 (1993) ("*Webster's Dictionary*") ("*chiefly Brit.* **3a** a man's undershirt . . . **b** a

knitted sleeved or sleeveless undershirt for women or sometimes children"); 19 *Oxford English*

*Dictionary* 575 (2d ed. 1989) ("*Oxford Dictionary*") ("A knitted or woven undergarment for the

upper part of the body, worn next to the skin").  The term "T-shirt" is defined in the Explanatory

Note to HS heading 61.09 as a lightweight knitted or crocheted garment "of the vest type" with,

*inter alia*, "long or short close-fitting sleeves" (a definition that excludes the Bra Top).

EN 61.09.  The term "singlet" is generally used to describe a garment worn as an undershirt or as

athletic wear.  *Webster's Dictionary* 2124 (1993) ("*chiefly Brit:*  . . . an undershirt or athletic

jersey") [11]; 15 *Oxford Dictionary* 523 (defining "singlet" as "[a]n unlined woollen garment

(knitted or woven), now usually close-fitting and worn as an undershirt or jersey"); Allison

Carter, *Underwear: The Fashion History* 153 (1992) (describing a singlet as "[a]n unlined male

garment (as opposed to the lined 'doublet', worn next to the skin for warmth.  In the C20th the

term has come to denote a scoop-necked, sleeveless and scantily cut *vest*"); V. Cumming, C.W.

Cunnington & P.E. Cunington, *The Dictionary of Fashion History* 187 (2010) (defining "singlet"

as a "type of vest" that is "closely-fitted to the body," while noting that "[i]n the 20th century it

became associated with sporting activities and was worn by both sexes" and "is now usually

sleeveless with a scoop neckline and is similar to a sleeveless **T-shirt**.").

---

[11] The term "singlet" in British English is also used to refer to an unlined waistcoat, a use of the term that does not appear relevant in the context of heading 61.09.  *Webster's Dictionary* 2124 ("*chiefly Brit:* **a** an unlined waistcoat").  *See* EN 61.10 and heading 6110, HTSUS, which include in the article description for the heading the term "waistcoats."

That the term " . . . singlets and other vests" as used in HS heading 61.09 (as applied to

knitted or crocheted garments) refers principally to undershirts is also indicated by the

appearance of this same term in two HS headings of chapter 62, in which it is used to refer *only*

to undershirts.  These headings are 62.07 (pertaining to certain men's and boys' garments) and

62.08 (pertaining to certain women's and girls' garments), both of which use the term to refer to

undershirts that are not knitted or crocheted.[12]  Garments designed to be worn on the upper part

of the body as outerwear are excluded from these two HS headings.  *See* ENs 62.07, 62.08.  In

contrast, the Harmonized System nomenclature places all undershirts ("vests") that are knitted or

crocheted within heading 61.09, regardless of the gender of the wearer.  *See* EN 61.09 (clarifying

that the articles mentioned in the heading "are classified in this heading without distinction

between male and female wear").[13]  Knitted and crocheted undergarments other than undershirts

and support undergarments are classified within HS headings 61.07 (men's and boys' wear) and

61.08 (women's and girls' wear), in a manner parallel to the organization of HS headings 62.07

and 62.08.

---

[12] The term "singlets and other vests" appears in the term "[m]en's and boys' singlets and other vests . . ." as used in the article description for heading 62.07 of the Harmonized Commodity Description and Coding System ("Harmonized System" or "HS").  The Explanatory Note to HS heading 62.07 clarifies that this term refers only to undershirts.  As discussed therein, heading 62.07 pertains to several classes of goods, namely, "underclothing for men or boys (singlets and other vests, underpants, briefs and similar articles), not knitted or crocheted," sleepwear for men or boys (nightshirts and pyjamas), bathrobes, and dressing gowns.  EN 62.07.  HS heading 62.08 is parallel to HS heading 62.07 with respect to women's and girls' wear, and it includes "[w]omen's and girl's singlets and other vests."  Like EN 62.07, EN 62.08 clarifies that this term refers only to undershirts.

[13] T-shirts, although included within heading 61.09, are not mentioned in the article descriptions for HS headings 62.07 and 62.08; this omission follows the organization of the HS headings because T-shirts are, by definition, knitted or crocheted garments and therefore are excluded generally from chapter 62.  *See* ENs 61.09 (defining T-shirts as "lightweight knitted or crocheted garments of the vest type"), 62.07, 62.08.

Although the international HS heading 61.09 is comprised of terms ("T-shirts, singlets and other vests") that refer to undershirts, the scope of the HS heading must be construed to include some garments that are adaptations of undershirts designed to be worn as outerwear. EN 61.09 makes this point by example, instructing that T-shirts, being garments "of the vest [*i.e.*, "undershirt"] type," remain classified in the heading even if they have decoration in the form of pictures or words. *See* EN 61.09. The T-shirt example in EN 61.09 should not be taken to mean that other outerwear garments—specifically, those that are not adaptations of undershirts— necessarily would fall within the scope of HS 61.09. The example in the Explanatory Note expressly refers to T-shirts as being "of the vest type." EN 61.09.

As discussed above, EN 61.09 clarifies that the class of garments identified in HS heading 61.09 as "vests," *i.e.*, undershirts, includes undershirts for women. However, the HS nomenclature does not consider women's undergarments worn on the upper part of the body and providing bust support, such as corsets, brassieres and similar such undergarments, to be properly described as undershirts or vests. These types of women's undergarments are described by the terms of HS heading 62.12, regardless of whether knitted or crocheted. *See* EN 62.12 ("This heading covers articles *of a kind designed for wear as body-supporting garments* or as supports for certain other articles of apparel, and parts thereof." (emphasis added)). These garments are expressly excluded from chapter 61 by an international HS legal note (which, as are HS legal notes generally, is effectuated in the HTSUS) and therefore cannot properly be classified under HS heading 61.09. HS Note 2(a) to ch. 61; *see* Note 2(a) to ch. 61, HTSUS ("This chapter does not cover . . . [g]oods of heading 6212 . . ."). Similarly, as body-supporting garments, these underwear garments are excluded from heading 62.08, which includes "[w]omen's or girls' singlets and other vests." *See* EN 62.08 ("This heading also **excludes** brassieres, girdles, corsets and similar articles (**heading 62.12**).").

It is apparent from note 2(a) to chapter 61 and from the structure of the relevant headings that the HS distinguishes between women's undershirts and women's upper-body support undergarments.  The former are classified in heading 61.09 (if knitted or crocheted), the latter are expressly excluded from that heading (whether or not knitted or crocheted).  In light of this distinction, and particularly in light of the terms of HS heading 61.09 as explained by EN 61.09 (which instructs that HS heading 61.09 is limited to vests and vest-type garments), the court does not consider that women's garments designed to be worn on the upper body and providing bust support, such as the Bra Top, could be classified under HS heading 61.09 solely because they are designed to be worn as outerwear rather than underwear.  The Bra Top is not "of the vest type" within the meaning of that term as used in EN 61.09, differing from T-shirts, singlets and other vests as to physical structure and as to purpose.  Designed as both an outerwear top and as a support garment, it serves two purposes, one of which a garment "of the vest type" does not.

The article description for heading 6109, HTSUS, is not identical to that of HS heading 61.09.  The heading has been modified from the HS to add the term "tank top," to delete the term "and other vests," and to add in place of the term "and other vests" the term "and similar garments."  Although the HS nomenclature uses the term "vests" to refer principally to undershirts, the HTSUS does not do so.  In American English, the term "vest" has a common meaning referring to one of several types of sleeveless outerwear garments for men or women that are designed to be worn over shirts or blouses.  According to *The Fairchild Dictionary of Fashion*, a lexicographic source for the fashion and apparel industry, a "vest" is "[a]n item of wearing apparel extending to the waist or below that is similar to a sleeveless jacket.  Usually worn over a blouse or shirt and sometimes under a suit jacket.  Also called a *waistcoat* and *weskit*."  *The Fairchild Dictionary of Fashion* 477 (3rd ed. 2003) ("*Fairchild Dictionary*").  In British English, the term "waistcoat" might be considered a synonym.  From the divergent

meanings of the word "vest" in American and British English, it is understandable that the

HTSUS does not use the term "vest" in the context of undershirts, confining the term to the

American English meaning.  Thus, the HTSUS deletes the term "vest" from heading 6109 and

effectuates HS heading 61.10 ("Jerseys, pullovers, cardigans, waistcoats and similar articles,

knitted or crocheted") as "[s]weaters, pullovers, sweatshirts, *waistcoats* (*vests*) and similar

articles, knitted and crocheted."[14]  Heading 6110, HTSUS (emphasis added).

        The question presented by the U.S modification of the HS nomenclature for heading

61.09 is whether Congress, in so doing, intended to enlarge the scope of heading 6109 from the

international nomenclature so as to encompass a garment such as the Bra Top.  As discussed

below, the court concludes to the contrary: Congress intended to limit the scope of heading 6109,

HTSUS in the same manner that HS heading 61.09 is limited, *i.e.*, to undershirts and outerwear

garments "of the vest type" that are adaptations of undershirts.  Garments such as the Bra Top,

being designed to provide bust support in addition to upper body coverage, are outside that

intended scope.

        In preparing the draft version of the HTSUS for congressional consideration, the U.S.

International Trade Commission ("ITC") explicitly recognized the obligation of the United

States, as a signatory of the Convention on the Harmonized System, to maintain consistency with

the HS nomenclature for the headings that were to be shared by all signatories to the Convention,

*i.e.*, the headings in chapters 1 through 97.  As the ITC stated, "[m]odifications of the scope of

the various parts of the Harmonized System are not permitted; however, further detailed

subdivisions for classifying goods (such as for tariff, quota, or statistical purposes) are permitted

---

[14] Woven (as opposed to knitted) garments that are, in the American English sense,
"vests" are classified under HS heading 62.11.  *See* EN 62.11 ("[**U**]**nlike heading 61.14** this
heading also covers tailored waistcoats separately presented, **not** knitted or crocheted.").

so long as they are added and coded at a level beyond the six-digit numerical code provided in

the Harmonized System." Investigation with Respect to the Operation of the Harmonized

System Subtitle of the Omnibus Trade and Competitiveness Act of 1988 at 1 (USITC Pub.

No. 2296) (June 1990). As the ITC recognized, the Convention requires that signatories, in

effectuating the HS in their respective domestic laws, not alter the scope of an HS heading.[15] As

did the ITC, Congress recognized the obligation to maintain consistency with the Harmonized

System, directing the ITC to keep the HTSUS under continuous review and to recommend

modifications to the President "necessary or appropriate" to "promote the uniform application of

the [Harmonized System] convention and particularly the Annex thereto." 19 U.S.C.

§ 3005(a)(2).

    Of course, Congress is free to enact a tariff heading with a different scope than that

provided by the drafters of the Harmonized System. But in light of the recognized obligation to

maintain HTSUS headings consistently with the HS, the court will not presume, absent an

indication of legislative intent, that Congress intended to do so in enacting the article description

for heading 6109. Where, as here, no such intent is manifest, the presumption must be that the

scope of heading 6109, HTSUS is the same as the scope of HS heading 61.09. *See Degussa*

*Corp.*, 508 F.3d at 1047 (intent of the drafters of the Harmonized System, which is expressed in

the Explanatory Notes, is "generally indicative of the proper interpretation of a tariff provision")

---

[15] Article 3, paragraph 1(a) ("Obligations of Contracting Parties") of the Convention on the Harmonized System states that each Contracting Party "shall use all the headings and subheadings of the Harmonized System without addition or modification" and "shall not modify the scope of the Sections, Chapters, headings or subheadings of the Harmonized System." Int'l Convention on the Harmonized Commodity Description and Coding System (with annex), art. 3, para. 1(a)(i), (ii) (1988). Paragraph 2 of the article creates a limited exception, providing that "[i]n complying with the undertakings at paragraph 1(a) of this Article, each Contracting Party may make such textual adaptations *as may be necessary to give effect to the Harmonized System in its domestic law*." *Id.* at art. 3, para. 2 (emphasis added).

(citation omitted).  As discussed below, the court concludes that the modifications Congress

effected to the article description for HS heading 61.09 were intended to maintain the distinction

between those garments that are either undershirts and outerwear garments adapted from

undershirts (*i.e.*, garments "of the vest type"), and those that provide bust support, whether

undergarments or garments designed as outerwear.

    The HTSUS does not define the term "tank top."  One dictionary definition is a

"close-fitting, low-cut top having shoulder straps and often made of lightweight, knitted fabric.

Also called **tank**."  *The Random House Dictionary of the English Language (Unabridged)* 1942

(2d ed. 1987).  *See also* 17 *Oxford Dictionary* 613 (defining "tank top" as "a sleeveless upper

garment with round neck and deep armholes, freq. of knitted material and similar to the top of a

one-piece bathing suit, worn by men or women; cf. *tank suit* . . .").[16]  Historically, a tank top was

a garment "similar to men's undershirt with U neckline and deep armholes shaped toward

shoulder to form narrow straps.  Similar to athletic shirt."[17]  *See Fairchild Dictionary* 38.  *The

Fairchild Dictionary* informs the reader that tank tops were "copied for . . . women in [the]

1960s and early 1970s" and "worn for track and active team sports"; these garments were

"[s]leeveless . . . with large armholes and scooped neckline[s]."  *Id.* at 403, 462.  *See Van Dale

Indus. v. United States*, 50 F.3d 1012, 1013 (Fed. Cir. 1995) ("*Van Dale II*") (identifying

definitions cited by plaintiff that "indicate . . . that T-shirts and singlets can be undershirts while

tank tops are similar to undershirts").

---

[16] A "tank suit" (or "tank swimsuit") is a "[c]lassic maillot swimsuit without skirt made with scooped neck and built-up straps.  *Der.*  Early indoor swimming pools were called 'tanks.'" *The Fairchild Dictionary of Fashion* 445 (3rd ed. 2003) ("*Fairchild Dictionary*").

[17] An "athletic shirt" or "A-shirt" is classified as an "undergarment" and defined as a "[m]an's sleeveless undershirt with low, round neckline, also worn for gym and sports." *Fairchild Dictionary* 462.

Because tank tops, whether designed as underwear or adapted as outerwear, are "of the vest (*i.e.*, "underwear") type," as are T-shirts, it was logical that the term "tank tops" would be added to the U.S. version of HS heading 61.09, *i.e.*, heading 6109, HTSUS.  In that respect, the article description for heading 6109 is unchanged from the first version of the HTSUS to go into effect, which was the 1989 version.[18]  Heading 6109, HTSUS (1989).  A draft version of the HTSUS prepared by the ITC and published in 1983 set forth the article description for heading 6109 in the form in which it was enacted ("T-shirts, singlets, tank tops, and similar garments, knitted or crocheted").  Conversion of the Tariff Schedules of the United States into the Nomenclature of the Harmonized System, Annex 1: Converted U.S. Tariff Schedule at 61-13 (USITC Pub. No. 1400) (June 1983).  It is plain that the ITC considered it appropriate to include tank tops within the proposed heading 6109 as early as 1983.  The term "tank top" appeared in the TSUS as converted to the HTSUS and appeared in two items in the 1978 version of the TSUS.  Items 380, 382, TSUS (1978).[19]

The record developed in this case contains evidence that "camisoles" with "shelf bras" were commercially significant in the 1990s but does not permit the court to determine whether these garments, or garments that could be described as "shelf bra tank tops" were articles familiar to commerce during the early 1980s, when the HS and HTSUS were being developed, or in 1978, when the term first appeared in the TSUS.  *See* Tr. 480, 482 (testimony of Ms.

---

[18] The 1988 and 1989 versions of the HTSUS (the latter going into effect on January 1, 1989), were prepared by the U.S. International Trade Commission and proclaimed under congressional authority.  Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100-418, 102 Stat. 1107, 1148 (Aug. 23, 1988) (relevant provisions codified at 19 U.S.C. §§ 3001, 3003, 3004 (1988)).

[19] The term "tank top" did not appear in the first version of the codified TSUS (1963). Tariff Act of 1962, Pub.Law. 87-456, 76 Stat. 72., reprinted in 77A Stat.

Armillas).  The court considers it significant, however, that no documents relating to the

development of the HTSUS indicate that bust-supporting "tank tops," if such were familiar to

commerce, were in the mind of the ITC in the early 1980s, when the article description for

heading 6109 was placed in final form and the conversion to the HTSUS was underway.  Nor is

there any indication that Congress intended that bust-supporting garments be included within the

term "tank tops" as used in the article description.  Had Congress intended to give heading 6109,

HTSUS a broader scope than that of HS heading 61.09 through the inclusion of the term "tank

top"—an intent that, as discussed above, would contravene the obligations and the shared goal of

the United States and other signatories of the Harmonized System Convention—it is reasonable

to expect that Congress would have made that intent known.

Heading 6109, like its international counterpart, HS heading 61.09, must be interpreted to

include undershirts for women as well as undershirts for men.  EN 61.09 (explaining that the

articles included within heading 6109 "are classified in this heading without distinction between

male and female wear"; *Van Dale II*, 50 F.3d at 1013-14 (classifying under heading 6109 a type

of women's undergarment worn on the upper body).  The lexicographic sources consulted by the

court indicate, however, that all of the *eo nomine* garments of heading 6109—T-shirts, tank tops,

and singlets—originally were designed as undershirts for men.  *See* C. Willet & P. Cunnington,

*The History of Underclothes* 137, 191, 240 (1992) (describing vests as men's undershirts with a

principal purpose of providing warmth and skin covering and describing singlets as men's

undergarments that displaced the vest in the 1930s); Alison Carter, *Underwear: The Fashion

History* 94, 137, 153 (1992) (indicating that T-shirts came into existence as men's undergarments

and that T-shirts adapted for women are worn exclusively for warmth next to the skin or over the

brassiere); *Fairchild Dictionary* 38, 403, 462, 473 (stating that T-shirts were originally men's

undershirts and that tank tops were men's undershirts adapted for wear by women in the 1960s

and early 1970s).  Because the garments specifically named in heading 6109, HTSUS, including

tank tops, were not originally designed for women, it is reasonable to conclude for this reason as

well that the garments of heading 6109, although designed to provide coverage of the upper

body, are not those of a type designed to provide bust support.  *See Van Dale II*, 50 F.3d

at 1013-14 (opining that the heading 6109 exemplars, as to purpose, "provid[e] warmth and

covering for modesty although not support to the breasts").  The Bra Top, which is not a garment

"of the vest type," and is instead a garment designed to give support to the bust, is not properly

classified as a "tank top" under heading 6109, HTSUS.

Nor is the Bra Top correctly described as a garment "similar" to "T-shirts," "singlets,"

and "tank tops" within the intended meaning of the term "and similar garments" as used in

heading 6109.  By comparing the article description of HS heading 61.09 ("T-shirts, singlets and

other vests") with the article description of heading 6109, HTSUS ("T-shirts, singlets, tank tops

*and similar garments*") (emphasis added), the need for inclusion of the words "and similar

garments" is evident.  The word "vests" (which describes all garments intended to be included in

the HS heading and limits the scope of that heading) having been deleted, some wording was

necessary in the HTSUS version to signify that some garments fall within the intended scope of

the heading even if they are not identified by the terms "T-shirts," "singlets," or "tank tops."  Of

course, it could be argued that in using the term "and similar garments" Congress could have had

the additional intent to broaden the heading beyond that of the international HS heading 61.09,

but the court would consider such an argument to be groundless.  As discussed above, there is no

indication that Congress intended to create a broader heading than the international one.  There is

no indication that the term "and similar garments" was included for any reason other than as a

substitute for "and other vests," and it would be inconsistent with sound statutory construction

for the court to ascribe a legislative intent or purpose that conflicts with the principles of the

Harmonized System Convention and is not indicated in the text of the statute or any

legislative history.

        Defendant asserts that by plaintiff's own admission, the Bra Top answers to the

description "tank top." Def.'s Mem. 12. Defendant points to the commercial invoice for the

entry, which specifies, *inter alia*, that the garment being entered is a "*basic tank* 3 pack with

shelf bra *tank top*," and also to the packing list, multiple country textile declaration,

manufacturer's certificate, beneficiary statements, and Non-Negotiable Sea Waybill, all of which

describe the Bra Top using identical language. *Id*. (citing Pl.'s Ex. 1) (emphasis added).

Defendant also points to the pre-production 2006 re-fit documentation which describes the

subject merchandise as "cami style 3 PK. scoop nk *tank*." *Id*. (citing Pl.'s Ex. 2) (emphasis

added). And defendant references Victoria's Secret's website, which tells the purchaser to

"choose your colors to build the perfect *tank* wardrobe." Def.'s Mem. 13 (citing Tr. 255)

(emphasis added). Defendant argues that in light of plaintiff's "admission" that the Bra Top is a

"tank" or "tank top," the Bra Top should be classified as a tank top under heading 6109, HTSUS

according to the principle that "'[a]bsent limitation or contrary legislative intent, an *eo nomine*

provision includes all forms of the named article, even improved forms.'" *Id.* 9-10 (citing

*CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1364-65 (Fed. Cir. 2011) ("*CamelBak*")

(citation omitted)).

        The court is not persuaded by defendant's *eo nomine* argument. First, the record fact that

plaintiff identified the Bra Top in various communications as a "tank" or "tank top" is not an

admission by plaintiff that the garment at issue is a "tank top" within the meaning of that term as

used in the heading 6109 article description. The meaning of a tariff term is a question of law

and, therefore, cannot be the subject of a factual admission by a party; instead, the court has the

"independent responsibility to decide the legal issue of the proper meaning and scope of HTSUS

terms." *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005) (citation

omitted).  Moreover, the manner in which an article is invoiced, labeled, and marketed is not

always dispositive of the issue of the proper tariff classification.  *See Rainin Instrument Co. v.*

*United States*, 27 CIT 1619, 1624, 288 F. Supp. 2d 1360, 1366 (2003); *Carl Zeiss, Inc.*, 195 F.3d

at 1380.  In the specific instance of the apparel industry, merchants sometimes attach familiar or

distinctive names to new or novel garments or adapt familiar garments for new purposes to

expand consumer appeal.  *See* C. Willet & P. Cunnington, *The History of Underclothes* 241

(1992).  Regardless, the court must discern the meaning of a tariff provision according to the

intent of Congress.  *Rubie's Costume Co.*, 337 F. 3d at 1357.

Second, the *eo nomine* principle on which plaintiff relies applies only "absent a shown

contrary legislative intent."  *See Nootka Packing Co. v. United States*, 22 CCPA 464, 470 (1935).

Here, there is contrary legislative intent, as shown by the intended, and limited, scope of HS

heading 61.09, which is the source of heading 6109, HTSUS.  Even if, for the purpose of

considering defendant's *eo nomine* argument, the court presumes that the Bra Top may be

described as a "tank" or "tank top" (although lacking the integral straps identified by plaintiff's

expert witness, Ms. Armillas, as a characteristic of tank tops), it would not follow that the Bra

Top necessarily falls within the scope of heading 6109, HTSUS.  To classify the Bra Top as a

"tank top" within the meaning of that term as used in heading 6109 is to enlarge the scope of the

heading impermissibly, beyond that intended by the drafters of the Harmonized System.

Citing *CamelBak*, 649 F.3d at 1365, defendant next argues that the Bra Top is a tank top

that has been "improved" by the addition of the shelf bra and that "[i]f the article is an

improvement but not transformed so as to change its identity, then the article is properly

classified within the *eo nomine* provision."  Def.'s Mem. 9-10.  Defendant argues, similarly, that

the shelf bra component of a Bra Top is an improvement or amplification that does not change

the "essential characteristic" of the garment, which defendant posits is that of a tank top.  In

advancing this argument, defendant relies on *Casio, Inc. v. United States*, 73 F.3d 1095, 1098

(Fed. Cir. 1996), for the proposition that "an article which has been improved or amplified but

whose essential characteristic is preserved or only incidentally altered is not excluded from an

unlimited *eo nomine* statutory designation."  The court rejects these arguments as well.

        The "identity" or "essential characteristic" of the garments identified *eo nomine* in

heading 6109 is that of undershirts (in British English, "vests") and adaptations of undershirts for

outerwear, such as T-shirts, which are considered garments "of the vest type."  EN 61.09.  Due to

the bust support function it provides, the Bra Top does not have the identity or essential

characteristic of an undershirt or "vest" as do other outerwear articles classified under the

heading, such as outerwear T-shirts and singlets for athletic wear.  But even if the court were to

presume, *arguendo*, that the Bra Top has the "identity" or "essential characteristic" of a "tank

top," that presumption does not resolve the question before the court, which is the proper scope

of heading 6109 as defined by the terms therein.  Defendant's "identity" and "essential

characteristic" arguments are not persuasive because garments providing bust support were not

intended for inclusion within heading 6109, as discussed *supra*.

        Relying on *St. Eve Int'l, Inc. v. United States*, 27 CIT 758, 267 F. Supp. 2d 1371 ("*St.

Eve*"), defendant argues that "the existence of support provided by a 'shelf bra' insert is not, in

and of itself, capable of transforming a garment from one classifiable as a 'tank top' in Heading

6109 into one classifiable in Heading 6212."  Def.'s Mem. 19 n.24.  *St. Eve*, however, is not a

precedent binding on the court.  Moreover, the case involved protests of redelivery notices, and

the opinion of the Court of International Trade ("CIT"), which principally addressed the issue of

whether the garments were underwear or outerwear, contains no analysis of the issue of whether

the "shelfbra camisoles" for which Customs issued redelivery notices were within the scope of

heading 6109 despite the presence of the "shelfbra."

Finally, defendant argues that "tariff terms are written for the future as well as the

present, meaning that tariff terms can be expected to encompass merchandise not known to

commerce at the time of their enactment, provided the new article possesses an essential

resemblance to the one named in the statute."  Def.'s Mem. 14 (quoting *Sears Roebuck & Co. v.*

*United States*, 22 F.3d 1082, 1084 n.2 (Fed Cir. 1994) (superseded by statute on other grounds)).

This argument also fails to persuade the court.  As the court discussed previously, the evidence

does not allow the court to determine whether garments of the "shelf bra camisole" type were

familiar to commerce when the heading 6109 article description was developed and enacted.  *See*

Tr. 480, 482 (testimony of Ms. Armillas).  Regardless, the court must determine the proper scope

of the terms of heading 6109 before classifying a good thereunder according to GRI 1.  The cases

defendant cites, which were decided under the TSUS, do not instruct the court in the

performance of this task.  GRI 1 does not permit classification of an article under a particular

heading based solely on a finding that the article bears an "essential resemblance" to an article

identified in that heading.

Because it concludes for the reasons discussed above that the Bra Top is not described by

a term of heading 6109, the court proceeds to consider the other candidate headings within the

HTSUS.

### 2.  The Bra Top Is Not Properly Classified under Heading 6212, HTSUS

Plaintiff claims classification of the Bra Top under heading 6212 ("Brassieres, girdles,

corsets, braces, suspenders, garters and similar articles and parts thereof, whether or not knitted

or crocheted").  Compl. ¶ 11; Pl.'s Mem. 25.  The court disagrees, concluding that the Bra Top is

not described by any term within that heading.

Of the *eo nomine* terms in heading 6212, only the term "brassiere" conceivably could describe the Bra Top.  However, the court's research has not found a standard dictionary definition of the term "brassiere" to which the Bra Top conforms, and plaintiff offers none. EN 62.12 instructs that the heading includes "[b]rassieres of all kinds," connoting that a garment not designed to be worn as underwear, such as one of a class of garments referred to in commerce as "sports bras," falls within the scope of the heading.  Indeed, one Webster's definition of "brassiere" is a "woman's close-fitting undergarment having cups for bust support, varying in width from a band to a waist length bodice, made with or without straps, and often boned or wired for additional support or separation; also: *an adaptation of this garment for sportswear*." *Webster's Dictionary* 269.[20]  The Bra Top is neither a women's undergarment designed to provide bust support (as required by the common definitions) nor an adaptation of such an undergarment for sportswear (*i.e.*, a sports bra).  The court concludes that the Bra Top is not defined by the *eo nomine* term "brassiere" as used in heading 6212, HTSUS.

The next question is whether the Bra Top is described by the term "and similar articles" contained within the heading 6212 article description.  In past cases in which the Court of Appeals, in determining tariff classification under the HTSUS, has construed a general term or phrase such as "and similar articles," it has applied the statutory construction principle of *ejusdem generis* to determine the meaning of that term or phrase.[21]  "In classification cases,

---

[20] Other lexicographic sources confine the definition of "brassiere" to an article of underwear.  *Oxford English Dictionary* defines a brassiere as "[a] woman's undergarment worn to support the breasts."  2 *Oxford English Dictionary* 494 (2d ed. 1989).  *Fairchild Dictionary* specifies that a brassiere is "[a] shaped undergarment worn by women to mold and support the breasts."  *Fairchild Dictionary* 463.

[21] *Ejusdem generis* is "[a] canon of construction holding that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed."  *Black's Law Dictionary* 594 (9th ed. 2009).

*ejusdem generis* requires that . . . the merchandise must possess the same essential characteristics

or purposes that unite the listed examples preceding the general term or phrase." *Avenues in*

*Leather, Inc. v. United States*, 178 F.3d 1241, 1244 (Fed. Cir. 1999) (citing *Totes, Inc. v. United*

*States*, 69 F.3d 495, 498 (Fed. Cir. 1995)).  "Classification . . . is appropriate only if the imported

merchandise shares the characteristics or purpose and does not have a more specific primary

purpose that is inconsistent with the listed exemplars." *Id.* (citations omitted).

The Explanatory Notes identify two classes of articles that are classified under

HS heading 62.12: "articles of a kind designed for wear as body-supporting garments" and

"supports for certain other articles of apparel . . . ."  EN 62.12.  All of the exemplars in the

heading 6212 article description—brassieres, girdles, corsets, braces, suspenders, and garters—

have as their essential characteristic and purpose either support of a part of the body or support

of a garment.

The Bra Top provides bust support, but it would be inconsistent with facts the court

found in this case to conclude that support is *the* essential characteristic or purpose of this

garment.  To so conclude would be to overlook the fact that the Bra Top is a garment that

incorporates the body-supporting characteristic of a brassiere into an outerwear garment that is

*not* a brassiere and that lacks a support function.  As the court found by a preponderance of the

evidence, the Bra Top can be described as a "shelf bra camisole," a garment that combines a

camisole "shell" and a "shelf bra" brassiere.  *See* Tr. 336 (testimony of Ms. Lynch), Tr. 401, 403,

461 (testimony of Ms. Armillas).  The uncontested facts establish that the outerwear shell

provides partial covering of the wearer's torso for warmth and modesty and that the garment can

be worn as an outerwear top.  JPO, Schedule C ¶ 8; Tr. 240, 255-56, 262-63, 268, 282-83,

292-93, 326-27, 331, 408; Pl.'s Ex. 3, Def.'s Ex. A.  And as the court found from its *in camera*

examination of the samples, the outerwear "camisole shell" component entirely conceals the

shelf bra component, other than the straps, and extends well below the shelf bra component.[22]
Pl.'s Ex. 3, Def.'s Ex. A.  The larger of the two components, the camisole shell is entirely
dissimilar to a brassiere and does not perform a body support function.

        The three garments listed as exemplars in heading 6212—brassieres, girdles, and
corsets—are almost invariably designed to be worn as undergarments, and the one exception, the
sports bra, is by definition an adaptation of a body-supporting undergarment.  The Bra Top is an
outerwear garment whose outer camisole shell does not provide body support but conceals the
shelf bra, extends to the waist, and allows the Bra Top to serve its outerwear purpose.

        In summary, the court concludes that the Bra Top is not a garment of a type that is
properly classified under heading 6212, HTSUS, being dissimilar to the garments listed in the
article description with respect to the essential characteristic and as to purpose.  The facts as
found by the court are sufficient to demonstrate that the shelf bra component of the Bra Top is
similar in construction and purpose to some types of brassieres, notably "soft-cup" brassieres
with a single cup and an elastic underbust band.  *See*, *e.g.*, Tr. 305, 311-14, 317, 325 (testimony
of Ms. Lynch).  Those same facts do not allow the court to conclude that the Bra Top *on the
whole* is "similar" to a brassiere or to any other garment or article named in the heading.
Discussing the consideration of the "characteristics or purposes" of an article, the Court of
Appeals has instructed that the "analysis must consider the imported merchandise *as a whole*."
*Avenues in Leather, Inc.*, 178 F.3d at 1246 (emphasis added).  And as the Court of Appeals
further stated, "[w]hen imported merchandise contains additional 'nonsubordinate or coequal'

_____

        [22] As the court also found by a preponderance of the evidence, the "shelf bra" component
of the subject garment requires for its function the straps that also are necessary to the camisole
component.  Tr. 336 (testimony of Ms. Lynch); Tr. 470-71 (testimony of Ms. Armillas).  In that
respect, the shelf bra component cannot, by itself, be described as a complete brassiere.

characteristics or purposes than a specific article listed as an exemplar, the merchandise is not

classifiable as that article."  *Id.* (citation omitted).

In support of its primary classification claim, plaintiff advances an argument grounded in

GRI 1 and one reliant on GRI 3.  Plaintiff's GRI 3 argument is that heading 6212 is preferred to

headings 6109 and 6114 by application of the rule of relative specificity, GRI 3(a), and if

GRI 3(a) is not dispositive, heading 6212 is preferred as it is "last in numerical order,"

GRI 3(c).[23]  Pl.'s Resp. 27-29; Pl.'s Mem. 48-52.  The court rejects this argument as a

misapplication of the GRIs.  The GRI 3, which is not to be applied if the question of the proper

heading is resolved by application of GRIs 1 and 2, applies if the merchandise is "*prima facie*[]

classifiable under two or more headings . . . ."  GRI 3, HTSUS.  Note 2(a) of Chapter 61,

HTSUS, which GRI 1 directs the court to consult along with the terms of the headings, excludes

from chapter 61 (and therefore from headings 6109 and 6114) the goods of heading 6212.  Were

the Bra Top described by a term of heading 6212, no "relative section or chapter notes," GRI 1,

HTSUS, would exclude it from that heading, and it would be classified thereunder regardless of

relative specificity or the numerical order of the headings.

Plaintiff's GRI 1 argument for classification of the Bra Top under heading 6212 alludes

to the "broad scope" of that heading.  Pl.'s Resp. 23-26; Pl.'s Mem. 47-48.  Plaintiff argues that

"[w]hat is critical and material for classification under Heading 6212 is that the garment provides

support, not that each and every component in the product be dedicated to performing the

support function."  Pl.'s Resp. 24.  Plaintiff cites *Van Dale Indus. v. United States*, 18 CIT 247,

---

[23] Plaintiff submits that GRI 3(b) is not implicated in this case because the Bra Tops "are
not '[m]ixtures, composite goods consisting of different materials or made up of different
components, and goods put up in sets for retail sale . . . .[']"  Resp. to Def.'s Post-Trial Br. 29
(Mar. 23, 2012), ECF No. 71 (quoting *Photonetics, Inc. v. United States*, 33 CIT ___, ___, 659 F.
Supp. 2d 1317, 1333 (2009)).

1994 WL 118415 (1994) ("*Van Dale I*") in making this argument, maintaining that the Bra Top

has "some support feature," which is "what the garments in Heading 6212 have in common."  *Id.*

at 25; Pl.'s Mem. 29-30.  Plaintiff's GRI 1 argument misconstrues the meaning of the term "and

similar articles" as used in heading 6212.  As the court discussed *supra*, garments other than the

named garments, which are brassieres, girdles, and corsets, are within the meaning of that term

only if body support is the *essential* characteristic and purpose of the garment when viewed as a

whole, as it is for the three named garments.  *See Avenues in Leather, Inc.*, 178 F.3d at 1244,

1246 (citations omitted).  It is insufficient for classification under heading 6212 that body

support merely be *among* the characteristics or purposes of the garment.

The holding in *Van Dale I* does not support plaintiff's GRI 1 argument.  The case

involved women's or girls' underwear tops classified by Customs under heading 6109, for which

the importer claimed classification under heading 6108 as women's or girls' underwear or in the

alternative under heading 6212.  *Van Dale I*, 18 CIT at 247, 1994 WL 118415 at **1.  In *Van

Dale I*, the Court of International Trade noted that the garment in question "d[id] not provide

support to the breasts or to any other body part," denied the claim for classification in

heading 6212, and affirmed the government's classification under heading 6109.[24]  18 CIT

at 252, 1994 WL 118415 at **4.  Plaintiff relies on the following statement in the CIT's opinion:

"Consistent with the Explanatory Notes, garments that provide little support would be properly

classifiable under Heading 6212, whereas garments that provide no support at all would be

classified elsewhere."  *Id.*  This statement is plainly *dicta*, the garment at issue in *Van Dale I*

---

[24] On appeal, the plaintiff abandoned its claim for classification under heading 6212, and
therefore the Court of Appeals, in affirming the judgment of the Court of International Trade, did
not consider whether the garment at issue was classifiable under that heading.  *Van Dale Indus.
v. United States*, 50 F.3d 1012, 1014 n.1 (Fed. Cir. 1995).

having been found to provide no body support.  No precedent binding in this case stands for the

principle that heading 6212 encompasses any garment that provides but "little support."

Plaintiff argues that heading 6212 is proper because "brassieres" constitute the "class or

kind" of garments to which the Bra Top belongs, as it contains a brassiere, which is provided for

*eo nomine* in heading 6212.  Pl.'s Mem. 30-37.  Relying on the multi-factor test sometimes used

by courts to ascertain the "class or kind" of merchandise covered by a tariff provision, as set

forth in *United States v. Carborundum Co.*, 536 F.2d 373, 377 (1976) ("*Carborundum*"),

plaintiff submits that "[i]t is undeniable that the subject garments are designed, marketed, sold,

and used as garments that provide support to the wearer in the same manner as a brassiere" and

should therefore "be considered to be garments that are 'similar' to brassieres–and that are

provided for in Heading 6212."  *Id.* at 37.  Plaintiff's reliance on *Carborundum* is misplaced.

*Carborundum* is a case decided under the TSUS.  Under the HTSUS, a *Carborundum* analysis

has been applied to determining class or kind of merchandise for purposes of a "principal use"

provision governed by Additional U.S. Rule of Interpretation 1(a), HTSUS.  *See Aromont USA,*

*Inc. v. United States*, 671 F.3d 1310, 1312-13 (Fed. Cir. 2012).  The question presented here does

not involve the construction of the statutory term "class or kind to which the imported goods

belong" (as does ARI 1(a)), but instead involves the question of whether a Bra Top is an article

"similar to" the articles mentioned *eo nomine* in heading 6212.

Moreover, even were the two legal tests considered to be the same, plaintiff's argument

still would not be convincing.  Any *Carborundum* analysis applied in this case would have to

contend with the evidence that the "class or kind" of garments to which the Bra Top belongs

must possess not only the support features of a brassiere but also the non-support features of an

outerwear "top" (a class or kind of garments for which the term "shelf bra camisole" has been

used).  Tr. 304, 401, 403, 461.  Plaintiff has not introduced evidence from which the court could

find that the Bra Top belongs to a class or kind of garments identified in commerce by the term

"brassiere" or any other term in heading 6212.

Plaintiff argues that the Bra Top answers to heading 6212 because "CBP has recognized

administratively that advances in fashion and technology require the scope of Heading 6212 to

be extended to outerwear garments that provide support." Pl.'s Resp. 15. Relying on Customs

classification rulings spanning the past twenty years, plaintiff points to several garments,

including a sports bra, costume bustier, "support" shorts that provide a knee taping function, and

heavily embellished brassieres, classified by Customs under heading 6212 despite being worn as

outerwear. *Id*. at 14-21 (citing Customs HQ 951264 (July 1, 1992) (RE: Revocation of

HRL 089778) (11/7/91) (sports bra); Customs HQ W968373 (Nov. 15, 2006) ("Gangsta Lady"

costume bustier); Customs HQ 965621 (Oct. 16, 2002) (knee support shorts); and Customs

HQ 950685 (Mar. 11, 1992) (embellished underwire and long-line brassieres)). Plaintiff

concludes that these rulings demonstrate conclusively that "it is clearly the support function (and

not the characterization as underwear) that is the common feature of the items in Heading 6212."

*Id*. at 22.

Customs rulings on merchandise are not binding on the court, and rulings such as those

cited by plaintiff are not accorded deference where, as here, they do not pertain to the

merchandise under consideration. Moreover, as the court discussed previously, the garments

identified *eo nomine* in heading 6212 are almost invariably underwear garments or are

adaptations of them (*e.g.*, the sports bra). The sports bra ruling plaintiff cites is not instructive

because the Bra Top is not an adaptation of a brassiere and is not similar to a sports bra. Nor are

the other Customs rulings plaintiff cites, even if presumed to be correct, instructive. The

costume bustier addressed in HQ W968373 and the knee support shorts of HQ 965621 are so

dissimilar to the Bra Top as to provide no meaningful guidance in this case.

Finally, plaintiff argues that the Bra Top must be classified in heading 6212 in order to be "historically consistent with both the evolution of the modern tariff and the structure of prior tariff provisions." Pl.'s Mem. 8, 52. According to plaintiff, "[u]ltimately, the U.S. tariff has always contemplated that brassieres (and other support articles) may be attached to clothing." *Id*. at 57. In support of its position, plaintiff undertakes an historical survey of predecessor tariffs, through which it attempts to demonstrate that the current tariff language manifests the drafters' intent to include garments such as the Bra Top within heading 6212. *Id*. at 53-58. Plaintiff directs the court's attention to a term in the Tariff Act of 1930: "[W]earing apparel or articles to which a 'brassiere[] . . . [or] similar body-supporting garment[]' . . . is attached." *Id*. at 53 (citing Tariff Act of 1930, 71st Cong., 2d Sess., Ch. 497, p. 666, ¶ 1529(c) (1930)).[25] Plaintiff's argument is unpersuasive because it is at odds with the proper construction of the terms in the heading 6212 article description. And plaintiff cites no legislative history to demonstrate an intent on the part of the drafters of the Harmonized System, or of the U.S. Congress when effectuating the HS in the HTSUS, that heading 6212 was ever intended to be so broad as to include a garment with the characteristics of the Bra Top.

### 3.  The Bra Top Is Properly Classified under Heading 6114, HTSUS

The court determines that heading 6114, HTSUS is the correct heading for classification of the Bra Top. This heading includes the term "[o]ther garments, knitted or crocheted." Heading 6114, HTSUS. The Bra Top is a knitted garment. JPO, Schedule C ¶ 11. As shown by

---

[25] The court notes that the phrase "similar articles" used in heading 6212, HTSUS, corresponds to the phrase "similar body-supporting garments" in TSUS Item 376 (1963). In turn, the phrase "similar body-supporting garments" in the TSUS corresponds to the phrase "all similar body-supporting garments" in paragraph 1529(c) of the Tariff Act of 1930. The phrase "all wearing apparel or articles to which, any of the foregoing . . . is attached" does not appear in the language of the HTSUS.

the relevant Explanatory Note, heading 6114 is a residual provision that "covers knitted or crocheted garments which are not included more specifically in the preceding headings of this Chapter [6101-6113]."  EN 61.14.

The Bra Top is not described by the terms of any heading in the group 6101-6113, HTSUS.[26]  Of those headings, heading 6109, HTSUS is incorrect for the Bra Top, for the reasons the court has explained, and only one other heading, heading 6106, HTSUS, deserves more than passing mention.  This heading, with the article description "[w]omen's and girls' blouses, shirts, and shirt-blouses, knitted or crocheted," does not describe the Bra Top, which for tariff classification purposes is not a "blouse," "shirt," or "shirt-blouse."  The General Explanatory Note to HS chapter 61 provides that "[s]hirts and shirt[-]blouses are garments designed to cover the upper part of the body, having long or short sleeves and a full or partial opening starting at the neckline."  EN to ch. 61.  The Bra Top lacks sleeves and an opening starting at the neckline. The General Explanatory Note to HS chapter 62 adds that "[b]louses are also designed to cover the upper part of the body but may be sleeveless and without an opening at the neckline."  EN to ch. 62.  Therefore, sleeveless "blouses" are not excluded from heading 6106 (*cf.* note 4 to ch. 61, HTSUS ("Heading 6105 [men's and boy's shirts] does not cover sleeveless garments")), but the Bra Top does not conform to any common definition of the term "blouse."  As applied in the context of a woman's garment, the definition of a "blouse" is "a loose-fitting garment covering

---

[26] Described very generally and as relevant to the question presented here, the scopes of the HTSUS headings in the group pertain to the following types of knitted or crocheted garments: men's and boy's coats (6101); women's and girls' coats (6102); men's and boy's suits, ensembles, jackets, overalls, trousers, and shorts (6103); women's and girls' suits, ensembles, jackets, dresses, skirts, overalls, trousers, and shorts (6104); men's shirts (6105); women's shirts and blouses (6106); men's underwear other than undershirts (6107); women's underwear other than undershirts (6108); T-shirts, singlets, tank tops and similar garments, for both sexes (6109); sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles (6110); babies' clothing (6111); track suits, ski-suits and swimwear (6112); and garments made of coated fabrics (6113).

the body from the neck to the waist or just below, made with or without a collar, sleeves, or belt,

and worn over or tucked inside a waistband (as of a skirt)." *Webster's Dictionary* 239. The Bra

Top is not "loose fitting," being designed instead for a moderately close fit on the body of the

wearer, and it has a low neckline, no part of which extends upward as high as the wearer's neck.

Pl.'s Exs. 3, 10; Def.'s Ex. A.

### 4.  The Bra Top Is Properly Classified in Subheading 6114.20.00, HTSUS

The only remaining question is the determination of the appropriate subheading under

heading 6114.  Plaintiff's alternate classification claim is under subheading 6114.20.00, as

identified in Count II of its complaint.  Compl. ¶¶ 28-34.

As required by GRI 6, the court determines the appropriate subheading from among the

subheadings of heading 6114 "according to the terms of those subheadings and any related

subheading notes and, *mutatis mutandis*, to the above rules [GRIs 1 through 5], on the

understanding that only subheadings at the same level are comparable."  GRI 6, HTSUS.  The

first level of subheadings under heading 6114 (*i.e.*, subheadings with six digits) divides the

heading into four categories, based on the textile material of the fabric from which the garment is

made.  Pursuant to note 2(A) and subheading note 2(A) to section XI, HTSUS, garments made

up of fabrics containing a mixture of two or more textile materials are classifiable according to

the "one textile material which predominates by weight over each other single textile fiber."[27]

---

[27] Subheading note 2(A) of section XI provides that "[p]roducts of chapters 56 to 63
containing two or more textile materials are to be regarded as consisting wholly of that textile
material which would be selected under note 2 to this section for the classification of a product
of chapters 50 to 55 or of heading 5809 consisting of the same textile materials."  Note 2(A),
section XI, HTSUS.  Note 2 of section XI states that "[g]oods classifiable in chapters 50 to 55 or
in heading 5809 or 5902 and of a mixture of two or more textile materials are to be classified as
if consisting wholly of that one textile material which predominates by weight over each other
single textile material."  Note 2, section XI, HTSUS.

Note 2(A) and subheading note 2(A), section XI, HTSUS.  The Bra Top is a blend of 95% cotton

and 5% spandex.  JPO, Schedule C ¶ 12.  From an examination of the garment label, the court

determines that cotton predominates by weight.[28]  Pl.'s Ex. 3, Def.'s Ex. A.  Subheading

6114.20.00, HTSUS, which describes garments made "[o]f cotton," is the appropriate

subheading.[29]  There are no second-level (*i.e.*, eight-digit) subheadings under subheading

6114.20.00.  Accordingly, the court concludes that the correct subheading is 6114.20.00,

HTSUS.

### III. CONCLUSION

For the reasons stated above, the court concludes that the correct tariff classification for

the Bra Top is subheading 6114.20.00, HTSUS, subject to duty at 10.8% *ad val*.  Judgment will

enter accordingly.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: May 1, 2013
New York, New York

---

[28] As required by the Textile Fiber Products Identification Act, 15 U.S.C. § 70, *et seq.*, the percentages on a garment's label are required to represent the weight of each constituent fiber in descending order.  15 U.S.C. § 70b(b)(1)-(2) (2006).  The fabric label on the Bra Top states that the garment contains "95%" cotton and "5%" spandex.  Pl.'s Ex. 3, Def.'s Ex. A.  There being no contrary evidence, the court determines that these percentages establish the predominance of the cotton by weight.

[29] Of the other subheadings under heading 6114, HTSUS, subheading 6114.10.00 covers garments made "[o]f wool or fine animal hair," subheading 6114.30 covers garments made "[o]f man-made fibers," and 6114.90 is a residual subheading that covers garments knitted "[o]f other textile materials."  The residual provision is thus limited to garments made of a natural fiber *other* than wool, fine animal hair, or cotton.

# UNITED STATES COURT OF INTERNATIONAL TRADE

**VICTORIA'S SECRET DIRECT, LLC**,

                   Plaintiff,

    v.

**UNITED STATES**,

                   Defendant.

**Before: Timothy C. Stanceu, Judge**

**Court No. 07-00347**

## <u>JUDGMENT</u>

Upon consideration of the record evidence, the post-trial briefs submitted by plaintiff Victoria's Secret Direct, LLC ("Victoria's Secret") and defendant United States, and all papers and proceedings herein, and in accordance with the court's Opinion issued this date, it is hereby

**ORDERED** that U.S. Customs and Border Protection ("Customs") shall reliquidate Victoria's Secret's Entry No. 113-3588476-0, classifying the merchandise therein, style number 194-423 (the "Bra Top"), in subheading 6114.20.00, HTSUS (2006), subject to duty at 10.8% *ad val*.; and it is further

**ORDERED** that Customs shall refund to plaintiff Victoria's Secret the excess duties paid on Entry No. 113-3588476-0, plus interest as provided by law.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: May 1, 2013
New York, New York